993 So.2d 614 (2008)
Rafael VARGAS, Appellant,
v.
ENTERPRISE LEASING COMPANY, a Florida corporation, Elizabeth Price, and Jimmy Middleton, Appellees.
No. 4D07-3929.
District Court of Appeal of Florida, Fourth District.
October 31, 2008.
*616 Marjorie Gadarian Graham of Marjorie Gadarian Graham, P.A., Palm Beach Gardens, and Mariano Garcia of Gonzalez Porcher Alber & Garcia, Lake Worth, for appellant.
David C. Borucke of Holland & Knight LLP, Tampa, for appellee Enterprise Leasing Company, a Florida corporation.
En Banc[1]
GROSS, J.
The issue before the court is whether by enacting 49 U.S.C. § 30106, the Graves Amendment, Congress preempted section 324.021(9)(b)2, Florida Statutes (2007), involving short term leases of motor vehicles. We hold that the Florida statute has been preempted and affirm the judgment of the trial court. We conclude that the section is neither a "financial responsibility law" nor a "liability insurance requirement" under the exceptions to preemption in 49 U.S.C. § 30106(b).
Enterprise Leasing Company leased a motor vehicle to Elizabeth Price for a period of less than one year. On February 12, 2006, Mrs. Price's son, Jimmy Middleton, crashed the rental vehicle into the rear end of a car driven by Rafael Vargas. Vargas filed suit against Price, Middleton, and Enterprise. The only count of the complaint directed at Enterprise claimed that the company was vicariously liable as the owner of the motor vehicle, pursuant to section 324.021(9)(b)2. Vargas did not contend that Enterprise was negligent, that its lease of a vehicle to Price was improper, or that it was in any way at fault for the accident. Enterprise filed an amended answer and affirmative defenses, asserting that pursuant to 49 U.S.C. § 30106, it had no liability.
The circuit court granted Enterprise's motion for summary judgment, ruling that the Graves Amendment preempted section 324.021(9)(b)2, which it determined was a vicarious liability provision and not a financial responsibility statute. After the entry of a final judgment consistent with Enterprise's *617 consent to judgment, Vargas timely filed a notice of appeal.
Congress enacted 49 U.S.C. § 30106 in 2005. The two pertinent subsections of the statute important to this appeal provide:
(a) In general.An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if
(1) the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and
(2) there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).
(b) Financial responsibility laws.Nothing in this section supersedes the law of any State or political subdivision thereof 
(1) imposing financial responsibility or insurance standards on the owner of a motor vehicle for the privilege of registering and operating a motor vehicle; or
(2) imposing liability on business entities engaged in the trade or business of renting or leasing motor vehicles for failure to meet the financial responsibility or liability insurance requirements under State law.
In subsection (a), the statute preempts state laws imposing liability on owners in the business of renting or leasing motor vehicles, except when there is negligence or criminal wrongdoing on the part of the lessor. Subsection (b) excepts from preemption those state "financial responsibility laws" (1) "imposing financial responsibility... for the privilege of registering and operating a motor vehicle," or (2) "imposing liability" on entities in the "trade or business of renting or leasing motor vehicles" for failing "to meet the financial responsibility or liability insurance requirements under State law."
In 1999, the Florida legislature created statutory caps on the amount of vicarious liability rental car companies could face under the dangerous instrumentality doctrine. Part of Florida's common law, that doctrine "imposes strict vicarious liability upon the owner of a motor vehicle who voluntarily entrusts that motor vehicle to an individual whose negligent operation causes damage to another." Estate of Villanueva v. Youngblood, 927 So.2d 955, 957 (Fla. 2d DCA 2006). "The dangerous instrumentality doctrine is unique to Florida and has been applied with very few exceptions." Aurbach v. Gallina, 753 So.2d 60, 62 (Fla.2000). In 1959, the Florida Supreme Court extended the doctrine to lessors, making them vicariously liable, as owners, for the lessee's negligent operation of a motor vehicle. See Susco Car Rental Sys. of Fla. v. Leonard, 112 So.2d 832 (Fla.1959). Against this legal backdrop, the legislature adopted section 324.021(9)(b)2, which provides:
(b) Owner/lessor.Notwithstanding any other provision of the Florida Statutes or existing case law:
2. The lessor, under an agreement to rent or lease a motor vehicle for a period of less than 1 year, shall be deemed the owner of the motor vehicle for the purpose of determining liability for the operation of the vehicle or the acts of the operator in connection therewith only up to $100,000 per person and up to $300,000 per incident for bodily injury and up to $50,000 for property damage. *618 If the lessee or the operator of the motor vehicle is uninsured or has any insurance with limits less than $500,000 combined property damage and bodily injury liability, the lessor shall be liable for up to an additional $500,000 in economic damages only arising out of the use of the motor vehicle. The additional specified liability of the lessor for economic damages shall be reduced by amounts actually recovered from the lessee, from the operator, and from any insurance or self-insurance covering the lessee or operator. Nothing in this subparagraph shall be construed to affect the liability of the lessor for its own negligence.
Ch. 99-225, § 28, at 1421-22, Laws of Fla.
Section 324.021(9)(b)2 comes within the preemption language of 49 U.S.C. § 30106(a), since it is a state law that imposes liability upon a lessor "by reason of being the owner of" a motor vehicle. Section 324.021(9)(b)2 states:
The lessor, under an agreement to rent or lease a motor vehicle for a period of less than 1 year, shall be deemed the owner of the motor vehicle for the purpose of determining liability for the operation of the vehicle or the acts of the operator in connection therewith ....
Id. (emphasis added). The statute thus involves precisely that type of vicarious liability targeted by the Graves Amendment, a liability derived from a status as owner, rather than fault. See Kumarsingh v. PV Holding Corp., 983 So.2d 599 (Fla. 3d DCA 2008). Vargas seeks to recover from Enterprise solely on the basis of vicarious liability.
Vargas's lawsuit is preempted unless section 324.021(9)(b)2 falls within the savings clause of section 30106(b). Vargas argues that his lawsuit comes within the savings clause because section 324.021(9)(b)2 is a "financial responsibility law" under section 30106(b). We reject that argument. Although Florida has adopted "financial responsibility laws," as the term was used by Congress, section 324.021(9)(b)2 is not one of them.
A court's "objective [in] interpreting a statute is to determine the drafters' intent." United States v. Grigsby, 111 F.3d 806, 816 (11th Cir.1997). Section 30106(b) speaks to "financial responsibility laws" and "financial responsibility." The federal statute does not define the term "financial responsibility." We therefore assume that Congress used the term according to its ordinary and common meaning, "unless it is apparent from [the] context that the disputed term is a term of art." Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1246 (11th Cir. 2008). "When Congress employs a term of art, it presumptively adopts the meaning and `cluster of ideas' that the term has accumulated over time." Id. at 1246-47 (quoting Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S., 506 F.3d 1364, 1368-69 (11th Cir.2007)). "The starting point for [the] interpretation of a statute is always its language," so that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Garcia v. Vanguard Car Rental USA, Inc., 510 F.Supp.2d 821, 829-30 (M.D.Fla.2007), aff'd, 540 F.3d at 1242 (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), and Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). One source of common usage is BLACK'S LAW DICTIONARY, which provides these definitions:

Financial responsibility. Term commonly used in connection with motor vehicle insurance equivalents. See also Financial responsibility acts.

*619 Financial responsibility acts. State statutes which require owners of motor vehicles to produce proof of financial accountability as a condition to acquiring a license and registration so that judgments rendered against them arising out of the operation of the vehicles may be satisfied.
BLACK'S LAW DICTIONARY 631 (6th ed. 1990). The common usage of "financial responsibility" thus means an insurance equivalent, that level of security required to pay for damages arising from motor vehicle accidents, as a condition of acquiring a driver's license or registering a vehicle. As a term of art, this is the meaning that the term has accumulated over time as many states have adopted minimum standards requiring drivers to be responsible for damages they cause.
Reaching a similar conclusion, the Eleventh Circuit has concluded "that Congress used the term `financial responsibility law' to denote state laws which impose insurance-like requirements on owners or operators of motor vehicles, but permit them to carry, in lieu of liability insurance per se, its financial equivalent, such as a bond or self insurance." Garcia, 540 F.3d at 1247.[2] That court recognized that its definition was similar to the common legal usage of the term.
Beginning in 1947, Florida adopted financial responsibility laws consistent with the ordinary and common meaning of the term utilized by Congress. It was in this limited way that the Florida legislature used the term "financial responsibility" when it passed the Financial Responsibility Law of 1955, which created Chapter 324, Florida Statutes. Ch. 29963, Laws of Fla. (1955). The legislature described the purpose of the statute as relating to a driver's duty to pay compensation for damages:
It is the intent of this chapter to recognize the existing rights of all to own motor vehicles and to operate them on the public streets and highways of this state when such rights are used with due consideration for others; to promote safety, and provide financial security by such owners and operators whose responsibility it is to recompense others for injury to person or property caused by the operation of a motor vehicle, so it is required herein that the owner and operator of a motor vehicle involved in an accident shall respond for such damages and show proof of financial ability to respond for damages in future accidents as a requisite to his future exercise of such privileges.

Ch. 29963, Laws of Fla. (1955), § 1 at 974 (emphasis added). After a driver was involved in an accident, the 1955 Act required him to show "proof of financial ability to respond for damages in future accidents," another way of saying "financial responsibility."
The 1955 Law's definition of "financial responsibility" is contained in the definition of the term "proof of financial responsibility"; it is the "ability to respond in damages for liability, on account of accidents arising out of the use of a motor vehicle," in the amounts of $5,000, $10,000, or $20,000, depending on the circumstances. § 324.021(7), Fla. Stat. (1955).[3] The 1955 law provided four ways to prove *620 financial responsibility: an insurance policy, a bond, a cash deposit with the state treasurer, or a certificate of self insurance. § 324.031, Fla. Stat. (1955); see § 324.031(1)-(4), Fla. Stat. (2007).
The Financial Responsibility Law of 1955 borrowed both its stated purpose and definition of "financial responsibility" from an earlier statute, Chapter 23626, Laws of Florida (1947). The expressed intent of this "ACT relating to proof of financial responsibility by owners and operators of motor vehicles" was to recognize that the right to operate a motor vehicle was subject to the:
public responsibility to be able to recompense anyone injured in person or property by the operation of motor vehicles on the highways of this State, so it is required herein that any owner or operator involved in an accident shall in the future show the ability to respond in damages as a requisite to his future exercise of such privileges.
Ch. 23626, Laws of Fla. (1947). The 1947 statute defined "proof of financial responsibility" as a "proof of ability to respond in damages for liability, on account of accidents occurring subsequent to the effective date of said proof, arising out of the ownership, maintenance, or use of a motor vehicle...."[4]
Florida's implementation of "financial responsibility" statutes was therefore consistent with the common usage of that term. Both the 1955 and 1947 acts employed the term in statutes that required owners of motor vehicles to produce "proof of financial accountability as a condition to acquiring a license and registration so that judgments rendered against them arising out of the operation of the vehicles might be satisfied." BLACK'S LAW DICTIONARY 631 (6th ed. 1990). As used by the Florida legislature, "financial responsibility" was compulsory insurance or its equivalent, triggered by an accident or an adverse judgment, which was a condition of operating or registering a motor vehicle. In Lynch-Davidson Motors v. Griffin, 182 So.2d 7, 8 (Fla.1966), the Florida Supreme Court described the operation of Florida's financial responsibility law and acknowledged its similarity to laws of other states:
[O]ur Financial Responsibility Law, like that of many other states, does not provide for compulsory liability insurance as a condition precedent to owning or operating a motor vehicle. Every owner or operator of a motor vehicle is allowed one `free' accident (that is, one uninsured accidentalthough he must, of course, respond in damages, from what assets he owns, for injuries to persons or property for which he is legally liable).
See Bankers & Shippers Ins. Co. of New York v. Phoenix Assur. Co. of New York, 210 So.2d 715, 718 (Fla.1968).[5]
*621 As Enterprise points out, Florida's passage of financial responsibility laws in 1947 and 1955 was part of a legislative movement in the last century to confront the effects of motor vehicle accidents. The United States Supreme Court described the development of financial responsibility laws in Kesler v. Dep't of Pub. Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962), overruled in part by Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), and Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). There, the United States Supreme Court referenced Florida as one of twenty-one states that had adopted "material provisions" of a "Uniform Code with respect to financial responsibility." Kesler, 369 U.S. at 165 n. 29, 82 S.Ct. 807.
In sum, Congress used the term "financial responsibility" in its ordinary and common meaning, the way the term was used in statutes in Florida and across the country, to denote a minimum level of compulsory insurance or its equivalent, which was a condition of licensure and registration. See Garcia, 510 F.Supp.2d at 830 (stating that "the common usage of the term `financial responsibility laws' means requiring an owner and/or operator of a motor vehicle to possess and have proof of minimum levels of insurance").
Given this definition of "financial responsibility," we conclude that section 324.021(9)(b)2 is not the type of law that Congress intended to exclude from preemption. The "Florida legislature's endorsement of and limitations on" the vicarious liability imposed under the dangerous instrumentality doctrine is not a "financial responsibility" requirement. Garcia, 540 F.3d at 1249.
First, section 30106(b)(1) exempts laws "imposing financial responsibility on the owner of a motor vehicle for the privilege of registering and operating a motor vehicle." Section 324.021(9)(b)2 is in no way linked to this privilege; it does not require short term lessors to purchase insurance. The monetary figures in the statute are caps on liability unrelated to a lessor's ability to register a motor vehicle. Sections 324.021(7), 324.051, and 324.071, Florida Statutes (2007), implement Florida's financial responsibility scheme.
Second, subsection 30106(b)(2) exempts state laws which "impos[e] liability on business entities engaged in the trade or business of renting or leasing motor vehicles for failure to meet the financial responsibility or liability insurance requirements under State law." Section 324.021(9)(b)2 is not a "financial responsibility or liability insurance requirement"; the section does not require short term lessors to purchase insurance. We agree with the analysis of the district court in Garcia concerning the interplay between this federal exclusion and section 324.021(9)(b)2:
[Section 324.021(9)(b)2] does not create insurance standards for entities that register and operate motor vehicles within Florida. Nor does it impose liability on owners of motor vehicles for failing to comply with state insurance requirements. A careful reading of § 324.021(9)(b)(2) shows that it does not impose any insurance requirements on anyone or even mention the term "financial responsibility." This section speaks solely in terms of "liability." A lessor of motor vehicles in the state of Florida could operate without any insurance whatsoever, and would never fall within the scope of § 324.021(9)(b)2. Rather, this section simply means that if you are engaged in the business of leasing or *622 renting motor vehicles for periods of less than a year, and if you are sued under a theory of vicarious liability, the maximum amount that you will be liable for (with or without insurance) cannot exceed $350,000.
The Plaintiffs place great emphasis on the provisions in § 324.021(9)(b)2 which raise the liability caps by an additional $500,000 if the lessor leases a motor vehicle to someone who carries insurance of less than $500,000. According to the Plaintiffs, this sentence establishes "the outward bounds of financial responsibility-$500,000-then uses a carrot-lower financial responsibility-to entice lessors to help assure that lessees will be financially responsible." The Plaintiffs are simply wrong. First, this provision does not impose any liability on lessors for failing to meet Florida's insurance requirements; it simply states that the most a motor vehicle lessor can potentially be held vicariously liable for may increase by another $500,000 in certain circumstances. It is a contingency provision, effectively creating a cost-benefit risk analysis for motor vehicle lessors. A lessor could choose to rent to operators who have lower levels of insurance without any consequences or penalties by the state. In such a situation, the lessor would merely assume the risk of possibly being liable for a higher level of damages should an accident and lawsuit ensue.
Garcia, 510 F.Supp.2d at 831 (footnotes omitted). As the district judge observed, no Florida statute requires owners or lessors of motor vehicles to "possess insurance in the amount of $500,000 combined property and personal injury. To the contrary, [section] 324.021[(7)] itself defines the minimum standards for insurance in Florida." Id.
Section 324.021(9)(b)2 is thus neither a financial responsibility statute nor an insurance requirement under section 30106(b). Rather, the statute is an outgrowth of the dangerous instrumentality doctrine that codifies and caps the vicarious liability imposed on lessors of motor vehicles. See Fischer v. Alessandrini, 907 So.2d 569, 570-71 (Fla. 2d DCA 2005) (recognizing that section 324.021(9)(b)2 was enacted to rectify "perceived inequities" in the dangerous instrumentality doctrine by imposing limits on the liability of lessors who rent or lease a motor vehicle for less than a year).
In a case involving section 324.021(9)(b)1, we rejected the notion that that statute was a financial responsibility law or insurance requirement. Folmar v. Young, 591 So.2d 220, 222 (Fla. 4th DCA 1991). After examining the legislative history and plain language of the act, we concluded that the statute "constitutes an exception to the dangerous instrumentality doctrine in the case of long-term lessors." Id.; see Kraemer v. General Motors Acceptance Corp., 572 So.2d 1363, 1367 (Fla. 1990) (citing Folmar with approval); Enterprise Leasing Co. v. Hughes, 833 So.2d 832, 838 (Fla. 1st DCA 2002) (holding that § 324.021(9)(b)2 "merely limits the liability of short-term lessors.... The statute reduces responsibility for damages arising from the fault of others but preserves full liability for compensatory damages caused by one's own fault. The statute merely caps the amount of damages for the vicarious liability of the lessor.").
Folmar also rejected the argument that the placement of the statute in Chapter 324, entitled "Financial Responsibility," controlled the characterization of the statute. Folmar, 591 So.2d at 222. Section 324.021(9)(b)2 was added to Chapter 324 in 1999, long after the earlier codifications of financial responsibility law. See Ch. 99-225, *623 § 28, at 1421, Laws of Fla. The section developed apart from the financial responsibility aspects of the chapter. Thus, Folmar rejected a superficial, label-based legal analysis and focused on the language of the statute in deciding the case.
For these reasons, we join with those courts that have concluded that the Graves Amendment preempts section 324.021(9)(b)2. See Kumarsingh, 983 So.2d at 600; Bechina v. Enterprise Leasing Co., 972 So.2d 925 (Fla. 3d DCA 2007); St. Onge v. White, 988 So.2d 59 (Fla. 1st DCA 2008); Garcia, 540 F.3d 1242; Garcia, 510 F.Supp.2d at 833; Dupuis v. Vanguard Car Rental USA, Inc., 510 F.Supp.2d 980 (M.D.Fla.2007).
We reject the analysis of Judge Farmer's dissent. First, the dissent fails to adequately address what Congress meant when it used the term "financial responsibility" in section 30106(b). This failure led to the opinion nullifying the intent of the statute. The heart of the dissent's reasoning turns on the inclusion of subsection 324.021(9)(b) in a chapter entitled "Financial Responsibility," and in a section entitled "Definitions; minimum insurance required." The opinion uses these labels to muse about the intent of the drafters of the Florida statute. However, what is important here is what Congress intended when it used the term "financial responsibility"; Congress did not define the term by reference to Chapter 324, Florida Statutes. The dissent's label-based legal analysis fails to acknowledge that Congress used the term in a specific historical context.
Second, Judge Farmer's discussion of federal preemption principles overlooks the basic tenet of statutory construction that a court should give effect to Congress' intent. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 530, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The dissent construes the Graves Amendment so broadly that vicarious liability disappears into "financial responsibility"; the exception thus swallows the rule.[6]
Next, Vargas contends that Congress does not have the authority, under the Commerce Clause, to preempt Section 324.021(9)(b)2, and similar state laws imposing vicarious liability on lessors of motor vehicles. Article I, Section 8 of the United States Constitution states that "Congress shall have the power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." On this issue, we agree with the detailed analyses of the Eleventh Circuit and district court in Garcia, and align ourselves with those courts that have upheld its constitutionality. See 510 F.Supp.2d at 833-837, aff'd, 540 F.3d at 1249-53; Bechina, 972 So.2d at 926-27; St. Onge, 988 So.2d at 59; Dupuis v. Vanguard Car Rental USA, Inc., 510 F.Supp.2d 980 (M.D.Fla.2007); Jasman v. DTG Operations, Inc., 533 F.Supp.2d 753 (W.D.Mich.2008); Flagler v. Budget Rent A Car Sys., Inc., 538 F.Supp.2d 557 (E.D.N.Y.2008); Seymour v. Penske Truck Leasing Co., No. 407CV015, 2007 WL *624 2212609, at *3-5 (S.D.Ga. July 30, 2007); Graham v. Dunkley, 50 A.D.3d 55, 852 N.Y.S.2d 169 (N.Y.App.Div.2008).
We also reject the constitutional challenges raised in the last two paragraphs of Vargas's initial brief. Vargas does not have standing to raise the due process/retroactive application claim, since the accident that gave rise to the lawsuit occurred six months after the effective date of the Graves Amendment. Because the Amendment is not applied retroactively to him, it is not being "applied to his disadvantage." See Utah Power & Light Co. v. Pfost, 286 U.S. 165, 186, 52 S.Ct. 548, 76 L.Ed. 1038 (1932). There is no substantive due process or equal protection violation, because the Graves Amendment satisfies the rational basis testCongress had the power to preempt imposition of vicarious liability on a national industry that markets a product that is a component of interstate travel, where vicarious liability imposes $100 million in costs on consumers.
Finally, we certify the following as a question of great public importance:
DOES THE GRAVES AMENDMENT, 49 U.S.C. § 30106 PREEMPT SECTION 324.021(9)(b)2, FLORIDA STATUTES (2007)?
Affirmed.
SHAHOOD, C.J., STONE, WARNER, TAYLOR and MAY, JJ., concur.
FARMER, J., dissents with opinion in which POLEN, STEVENSON and HAZOURI, JJ., concur.
HAZOURI, J., dissents with opinion in which FARMER and STEVENSON, JJ., concur.
KLEIN and DAMOORGIAN, JJ., recused.
FARMER, J., dissenting.
Straightaway I concede the daunting length of this dissent. So I begin with a précis of my essential disagreement with the majority, their analysis and the authorities on which they rely.
Buried within this Graves Amendment[7] litigation lie two inescapable truths about the statutes in this preemption argument:

First, the only State laws invalidated by Graves § (a) are those imposing vicarious liability on lease/rental car Companies[8] for the fault of others, but Graves § (b)(2) does not relieve these Companies from any insurance responsibilities they have under State law.

Second, the applicable Florida insurance laws, including § 324.021(9)(b),[9] eliminate the vicarious liability of these Companies when they force their Customers[10] to have liability insurance coverage, which must be backed up if necessary by the Companies' own blanket insurance.
Both of these realities about statutory substance and purpose have been obscured or simply missed by all the decisions on the Graves Amendment.
In this case, preemption turns on the relationship between two statutes. If they are harmonious, each achieving essentially the same ends, there can be no preemption. If they were antagonistic, really opposed *625 to each other, this federal law would preempt State law. To find out how they relate, one must necessarily appreciate the purpose, substance and function of each statute.
In this case these essential statutory aspects are accessible to those without law degrees. Understanding does not come to us from parsing particular words and phrases in search of arcane meanings, for both statutes employ plain and common terms, now widely used in and outside of legal forums. The failure of the majority to recognize their purpose, substance and function actually arises from their inquiry into the incunabula of the State statute. Thus with traditional statutory construction they hope to learn "what the meaning of is is." This instead of searching for core ideas.
The striking thing about the majority's reliance on Garcia,[11] the federal appellate decision holding § 324.021(9)(b) preempted by Graves § (a), is its utter misapprehension of these statutes. In truth, neither court offers to explain how they arrived at the inherent premise for its holding. How does a State law ending the vicarious liability of the Companies when they provide security for financial responsibility through minimum insurance requirements have any conflict with a federal law not affecting financial responsibility insurance obligations imposed under State law and which preempts only the vicarious liability of the Companies? Where's the clash? How is the one antagonistic to the other? What is the conflict between these statutes? We are not told.
Garcia and the majority seem to think that Congress must have further abolished any duties Companies might have to secure financial responsibility for an injured victim. They apparently believe that when Congress preempted vicarious liability it also meant to relieve Companies of any role in providing security for payment of injuries. Indeed, both contend that allowing § 324.021(9)(b) to stand against preemption as a financial responsibility law would "swallow" the preemption provision.[12] But they fail to explain how that would be so.
That might be true, if the federal statute ended with the text of Graves § (b)(1). But it does not end there. Graves § (b)(2) is part of the law, too. And so  ironically  Garcia and the majority actually end up interpreting Graves § (a) to swallow Graves § (b)(2). Both courts use statutory construction to devour another entire provision in the same statute. By this process do we arrive at the meaning of is.
Garcia and the majority read Graves § (b)(2) to mean just those State laws making minimum liability insurance compulsory for the registration of vehicles by Companies.[13] They argue that § 324.021(9)(b) does not in so many words directly compel Companies to procure liability insurance. To be a financial responsibility law within Graves § (b)(2), they seem to say, a State statute must directly compel the Company to purchase the insurance as a condition to register and hence operate a lease or rental vehicle. Thus § 324.021(9)(b) is not a financial responsibility law because its minimum insurance amounts are not compulsory and *626 are not tied to a Company's registration of a vehicle.[14]
I hate to harp on text, but Graves § (b)(2) does not say anything about directly requiring Companies to buy the insurance for registration of vehicles, as Graves § (b)(1) does. Congress composed Graves § (b)(2) to save State laws entailing either a financial responsibility or a minimum insurance requirement. Graves § (b)(2) foreswears any specification as to how the requirement is to function, directly or indirectly. The text of Graves § (b)(2) applies to all State financial responsibility laws imposing a minimum insurance without limit. We are simply left to divine why it would be necessary to include the text of Graves § (b)(2) if Congress intended to save only those laws described in Graves § (b)(1). Graves § (b)(2) is superfluous.
In this they overlook a most important feature about the substance and function of Graves § (b)(2). It does not refer to, or specify, any single part or aspect of any State's financial responsibility laws or minimum insurance requirements. Hence, Congress is here referring unmistakably to a whole category or class of laws  not to a single aspect or one part of any such laws. The plain meaning is thus not about narrow subsets of the category, as the majority concludes. By referring to these State laws generically, Congress plainly meant for Graves § (b)(2) to apply to any law a State has made part of its universe of financial responsibility and minimum insurance laws.
How do we know that? The answer is that Congress intentionally and purposefully omitted any special definition of financial responsibility laws of its own because this term is widely used and understood to refer to an entire class of laws.[15] Congress said not a single word constricting the meaning of Graves § (b)(2) to some narrow part of these laws  such as the limited definition conceived by Garcia and the majority.[16]
*627 The majority say their interpretation is the common understanding of the critical terms of Graves § (b)(2).[17] In American English, the words financial responsibility  whether used in federal or State law are not obscure or ambiguous and do not require interpretation. Far from constituting applicable legal arcana, these words connote what has become a countrywide institution touching the lives of nearly everyone. They verbalize a simple idea: security requirements for those owing a monetary obligation to someone affected by or involved in a motor vehicle accident. *628 When the context is motor vehicles, the words plainly impart the duty of making provision for security to pay for injuries inflicted by a vehicle on a victim in an accident.[18]
Because the analysis in Garcia and the majority opinion focuses solely on what they conceive as a single aspect of all financial responsibility laws, they have actually reconstructed Graves § (b)(2) to their own liking. Their method of statutory construction really became an exercise in law-making rather than law-interpreting. They openly add terms to Graves § (b)(2) Congress chose to omit.
They also use this purposeful Congressional omission of specificity to imply without saying so in clear words  that this provision is legally ambiguous. If Graves § (b)(2) were ambiguous, I suppose such vagueness might justify some resort to a proper use of the substantive or linguistic canons of statutory construction to ascertain the substance and purpose of the law.[19]
But Congress and the Supreme Court have given us two separate interpretive presumptions for a surer-footed understanding when preemption of insurance regulations seems lurking. The problem for Garcia and the majority, however, is that these Congressional and Supreme Court presumptions are set strongly against their analytical method and conclusions. Garcia and the majority simply ignore these presumptions.
The first interpretive presumption is statutory. Congress has long since made clear that federal law does not involve itself in the regulation of insurance  leaving that subject exclusively to the States under their traditional police powers. In the McCarran-Ferguson Act, Congress declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."[20]
*629 And as the Supreme Court points out, McCarran-Ferguson removed all dormant Commerce Clause scrutiny of State insurance laws. But the analysis of Garcia and the majority depend heavily on a dormant Commerce Clause scrutiny for its conclusion. They construe Graves § (b)(2) and § 324.021(9)(b) with undue strictness and Graves § (a) with undue broadness, when the McCarran-Ferguson presumption counsels powerfully against these interpretive attitudes. The proper mind-set laid down in the McCarran-Ferguson Act is that where federal regulation of insurance seems arguably involved  as with Graves § (b)(2)  judges must read federal legislation to avoid that construction.
Second, the Supreme Court has adopted a specific and pertinent presumption on preemption of State laws involving public health and safety, which obviously applies with special force to federal legislation referring to motor vehicle liability insurance and financial responsibility. Preemption of State law by federal statute is founded on the Supremacy Clause of the Constitution, not the omnipotence of absolute monarchy.[21] It is a necessary constituent in a federal system of shared powers. The Government of the United States has been afforded primacy only in matters exclusively assigned to it by the Constitution.[22] The powers given to the federal government deal primarily with commerce among the states, military affairs and foreign policy. On the other hand, the authority left with the several States is prominently the police powers for public health and welfare.
As a consequence, the Supreme Court has set a long-standing presumption against any Congressional intent to supersede the historic police powers exercised by the States in matters of public health and safety unless Congress has made such a purpose "clear and manifest" in plain language.[23] As the Court said:
"It should never be held that Congress intends to supersede ... the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said  and the principle has been often reaffirmed  that `in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.'").[24]
*630 More recently the Court has made quite explicit the correct judicial policy focus for determining preemption of this kind of State police power legislation:
"interpretation [of federal statutes for preemption] is informed by two presumptions about the nature of pre-emption. First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has `legislated ... in a field which the States have traditionally occupied,' we `start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' Although dissenting Justices have argued that this assumption should apply only to the question whether Congress intended any pre-emption at all, as opposed to questions concerning the scope of its intended invalidation of state law, we used a `presumption against the pre-emption of state police power regulations' to support a narrow interpretation of such an express command in Cipollone. That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety. [c.o., e.s.][25]
To find § 324.021(9)(b) preempted by Graves § (b)(2), we must disregard this entire line of Supreme Court decisions. In direct opposition to them, we must impose a broad meaning on the preemption text in Graves § (a) and a strict interpretation on the saving provision in Graves § (b)(2).
Indisputably, these Supreme Court decisions require just the opposite. These holdings require us to understand that the text of Graves § (a) is limited solely to that which is stated clearly and manifestly. Correspondingly they also necessarily require less strictness in discerning the meaning of Graves § (b)(2). We must hold saved from preemption any law even arguably within the terms of the savings provision. That necessarily means any law the State itself has explicitly denominated a financial responsibility law or minimum insurance requirement.
What is the justification for the majority's disregard of these "basic tenets" of preemption analysis? Is it enough to rely solely on general principles used in ordinary statutory construction when the weighty Constitutional principles of federalism and State public safety responsibility for vehicle liability insurance law are not involved? The answer to those questions is found in still another Supreme Court precedent on preemption.
Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962), is unusually apt because it dealt with  as here  a supposed conflict between federal legislation and a State financial responsibility law. Federal bankruptcy law discharged the obligation to pay a judgment debt. At the same time, a Utah law authorized the judgment creditor to continue to pursue payment of the discharged debt by forcing compliance with a State financial responsibility law provision making payment of damages from an accident a condition for reinstating State driving privileges. Justice Frankfurter's opinion for the Court rejected the usual modes of statutory construction in favor of ascertaining the substance and purposes behind the two statutory provisions to determine whether there really was a conflict between them. He first recalled why the *631 Court had earlier upheld a similar New York law:
"This Court was of course aware of the practical pressures of the New York statute as a device to collect debts discharged in bankruptcy; the argument was pressed upon it in the dissent. Yet the statute was upheld. Why? Because the `police power' of a State, especially when exerted for the protection of life and limb, is as pervasive as any of the reserved powers of the States and should be respected unless there is a clear collision with a national law which has the right of way under the Supremacy Clause of Article VI. The facts that the consequences of the New York Safety Act may in fact have subjected a debtor to the payment of money of which as an obligation in the creditor-debtor relation he was quit did not lead this Court to hold that the State had intruded into the bankruptcy domain or subverted the purpose of the bankruptcy law. Why? At the heart of the matter are the complicated demands of our federalism." [e.s.]
369 U.S. at 172, 82 S.Ct. 807. In upholding the Utah statute against preemption he explained:
"Utah is not using its police power as a devious collecting agency under the pressure of organized creditors. Victims of careless car drivers are a wholly diffused group of shifting and uncertain composition, not even remotely united by a common financial interest. The Safety Responsibility Act is not an Act for the Relief of Mulcted Creditors. It is not directed to bankrupts as such. Though in a particular case a discharged bankrupt who wants to have his rightfully suspended license and registration restored may have to pay the amount of a discharged debt, or part of it, the bearing of the statute on the purposes served by bankruptcy legislation is essentially tangential."
369 U.S. at 174, 82 S.Ct. 807. Garcia and the majority opinion do not even begin to explore why the actual purpose and substance of the Florida law involved here is not just as compatible with the purpose and substance of the Graves Amendment as the Utah and New York financial responsibility laws were with bankruptcy law in Kesler.
If used here properly, Kesler analysis would reason thus. It is obvious Florida is not using § 324.021(9)(b) as a devious avoidance to retain a hidden vicarious liability of Companies. The State's financial responsibility laws with their minimum insurance requirement do not create a circuitous route to effectuating vicarious liability for damages not covered by insurance. Their primary effect is not even really directed at the Companies but instead primarily to their Customers, who are the ones initially obligated to secure the financial responsibility, minimum insurance coverage. If § 324.021(9)(b) functions as its text obviously indicates, there is no adverse effect at all on preemption of vicarious liability laws in Graves § (a) because under State law the Companies will have no liability of any kind  vicarious or otherwise  to pay for the injuries. Payment comes from the insurance. Properly understood, therefore, Florida's statute proceeds harmoniously along with the Graves Amendment, together achieving the same results.
We shall find ourselves seriously distorting preemption analysis if we slight Justice Frankfurter's method here. Neither Garcia nor the majority ask the pertinent questions. Indeed, like the opinions of the other courts on which they rely,[26] they give *632 the impression that the only role of judges is to find some rationale for sustaining preemption of Florida laws affecting any responsibility of these Companies touching leased/rented vehicles. They do not try to ascertain genuine conflict between the actual substance and function of the Graves Amendment and § 324.021(9)(b). They do not ask how their substances are so incompatible with each other that Congress must be understood to have expressed an implied intent to preempt even the clear minimum insurance requirement in § 324.021(9)(b).
Understanding the Graves Amendment is not a mystery. This statute was not meant to eliminate just any liability imposed on the Companies by State law. Congress was addressing consequences after a vehicle has been let by lease or rent to someone else, whose negligence causes an accident, leaving a victim with injuries. Our traditional system of tort liability has always been based on fault. Congress was concerned about imposing unlimited vicarious liability on the Companies for all damages. After they lease or rent a vehicle to another, these Companies are in no position then to exercise any control over the operation of the vehicle. Congress found the legal rule making the Companies pay for the full range of damages caused by the fault of their Customers an undesirable effect on commerce.
The text of the Graves Amendment makes obvious that its purpose was to end vicarious liability under the dangerous instrumentality doctrine but only while insisting on keeping intact State duties, responsibilities or liabilities requiring security for the payment of damages to victims of accidents. Hence vicarious liability could be abolished but not the role of the Companies to make certain an existing mechanism to provide security for the payment of damages. The very existence of Graves § (b)(2) makes obvious that Congress refused to impinge on anything having to do with such security under any applicable form of financial responsibility laws. In Graves § (b)(2) Congress explicitly declared that it had laid no hand on minimum liability insurance requirements in such laws. And this whether or not such laws directly or only indirectly impose some responsibility on Companies for failing to meet these insurance requirements.
Before the Florida Legislature enacted § 324.021(9)(b) in 1991, a Company faced full vicarious responsibility under its Common Law for all injuries caused by its vehicles. By this 1991 State statute, however, the Company would have to provide in its contracts that the Customer is primarily obligated to obtain liability insurance coverage. If a Customer fails to have the specified liability insurance in effect, the Company could protect itself under a blanket policy affording a specified minimum of coverage. If the Company does so, it avoids any vicarious liability for any accident. When a Company complies with the statute, it has no further liability or *633 responsibility. Thus instead of vicarious liability, with § 324.021(9)(b) the only liability of the Companies is a duty to secure the placement of minimum insurance specified in the statute.
Florida's law was already an existing comfortable fit with the purpose of Congress when the Graves Amendment was being drafted. Chapter 324, Florida Statutes, had already been specifically designated by the Legislature as the State's "Financial Responsibility" Law. One specific statute contained within Chapter 324 explicitly states that the Chapter's purpose is to "provide financial security requirements for such owners or operators whose responsibility it is to recompense others for injury to person or property caused by the operation of a motor vehicle."[27] Florida's Legislature further designated § 324.021(9)(b) with the title "minimum insurance required."[28] Then, in still another part of Chapter 324, namely § 324.032(1)(b), the Legislature provided:
"A person who is either the owner or a lessee required to maintain insurance under s. 324.021(9)(b) and who operates limousines, jitneys, or any other for-hire passenger vehicles, other than taxicabs, may prove financial responsibility by furnishing satisfactory evidence of holding a motor vehicle liability policy as defined in s. 324.031."[29] [e.s.]
The plain text of the Chapter and these statutes therefore express a purpose to have § 324.021(9)(b) impose a requirement on the Companies to see that insurance is maintained. In the face of this clear text, is it really possible to hold that § 324.021(9)(b) is not a financial responsibility, minimum insurance law?[30]
Section 324.021(9)(b) fixes financial responsibility through a liability insurance requirement. Section 324.021(9)(b) fixes minimum insurance requirements as the basis for eliminating vicarious responsibility of the Companies. They force the Companies to place these minimum insurance requirements in every lease or rental contract. If the Customer should fail to comply with the contract and have such insurance in effect, then the Company must itself have back-up coverage or face liability for the fault of the operator of the vehicle. Essentially, the Company's only duty under this statute is to see that insurance is actually in effect at all times.
Why doesn't this mosaic of financial responsibility laws qualify? Where does Graves § (b)(2) specify that financial responsibility laws must be formed from a single stone rather than by a composite? *634 Why are these Florida laws not read together as an adjustment of monetary responsibility by providing security for payment of damages to persons injured by operation of Companies' vehicles? Congress knew that Florida had explicitly designated § 324.021(9)(b) to impose a financial responsibility and a liability insurance requirement on commercial entities renting or leasing vehicles for use on Florida roadways. But Congress added not a single word excluding Florida's laws from Graves § (b)(2).
Folmar v. Young, 591 So.2d 220 (Fla. 4th DCA 1991), explicitly construed § 324.021(9)(b) to be a financial responsibility law. We said:
"Section 324.021(9)(b) defines the minimum automobile liability insurance requirements. Under the statute, the following factors constitute exemptions precluding the lessor from financial responsibility for acts of drivers.
`(9)(b) Owner/Lessor.-Notwithstanding any other provision of the Florida Statutes or existing case law, the lessor, under an agreement to lease a motor vehicle for 1 year or longer which requires the lessee to obtain insurance acceptable to the lessor which contains limits not less than $100,000/$300,000 bodily injury liability and $50,000 property damage liability; further, this subsection shall be applicable so long as the insurance required under such lease agreement remains in effect, shall not be deemed the owner of said motor vehicle for the purpose of determining financial responsibility for the operation of said motor vehicle or for the acts of the operator in connection therewith.'
The plaintiffs argue that the statute requires that each lessee must carry liability insurance of $100,000/$300,000 and property damage insurance of $50,000, and point out that while there is more than one lessee in the case at bar, only one of them obtained the insurance. In other words, they claim the insurance financial responsibility coverage is `per lessee' and not simply `per vehicle.' ... Here, the plain meaning of the statute is that each lease agreement requires insurance in the stated minimum amounts." [e.s.]
591 So.2d at 221-222.
Nonetheless, the majority say Folmar "rejected the notion that the statute was a financial responsibility law or minimum insurance requirement." Their conclusion is impossible. Rather than rejecting the notion; Folmar openly embraced it. The majority also say that Folmar held that the placement of the statute in Chapter 324 has no bearing on its meaning. What the Folmar court actually said about the placement in Chapter 324 is: "Although section 324.021(9)(b) is in the financial responsibility chapter, we do not believe that the specific penalties provided for in section 324.051 apply." [e.s.] Again their argument misstates Folmar. And Folmar is not alone. Section 324.021(9)(b) has been repeatedly construed by Florida courts to impose a minimum insurance requirement.[31]
*635 Florida's statutes effectually allocate the responsibility to pay damages by shifting it from the Company to the operator of the vehicle causing the accident and insurance. This qualifies them as financial responsibility laws. See Kraemer v. General Motors Acceptance Corp., 572 So.2d 1363, 1364 (Fla.1990) ("dangerous instrumentality doctrine seeks to provide greater financial responsibility [e.s.] to pay for the carnage on our roads"). If the dangerous instrumentality doctrine is itself a form of financial responsibility law, then manifestly a statute shifting the allocation of responsibility between the Company and its Customer must equally be a financial responsibility law.
The majority assert: "Congress used the term [financial responsibility] in a specific historical context." This argument masks an implication that because it is historical inquiry theirs has the scientific purity of, say, DNA analysis. It does not. History is subjective  most especially when it claims to be entirely objective. Historical analysis takes the form of plucking from the mass just those facts fitting a thesis. Deciding which to include in the narrative and which to leave out involves preference, purpose and planning. No historical analysis  and this includes the inquiry into and the analysis of legislative history  is free from bias and purpose.[32] Labeling analysis "historical" does not per se make it reliable and authoritative. In this instance their search for "historical context" ends up adding words to a statute rather than purely finding meaning.
Anyway, there is nothing in the Graves Amendment to suggest a "specific historical context". The only context pertinent to the Graves Amendment is the present-day elimination of vicarious liability of Companies without affecting State financial responsibility laws or minimum insurance requirements. Of what relevance is the historical development of financial responsibility laws in place 50 years before Congress acted? How would Graves § (b)(2) involve historical reference when the text enacted does nothing more than save those State laws effective at enactment or becoming effective afterwards?
State motor vehicle financial responsibility laws involve an array of provisions for securing payment of damages to accident victims. These include liability insurance, bonds, certificates of deposit, uninsured motorist insurance, personal insurance coverage, to name only part. They involve pre-accident remedies, and post-accident duties and conditions. But Congress did not lay down any limiting or specified definition of financial responsibility laws in Graves § (b)(2). So the question is this. By what logic of interpretive rules could a court look for a narrow meaning in place of the obvious categorical usage?
Simply put, Garcia and the majority opinion are well outside this compelling body of interpretive law. Because of that conflict, I join in certifying the issue to the Florida Supreme Court.
POLEN, STEVENSON and HAZOURI, JJ., concur in this dissent.
HAZOURI, J., dissenting.
I respectfully dissent. What may seem obvious but not addressed by the majority *636 is that Congress could have preempted any state's statute or decisional law permitting the application of the dangerous instrumentality doctrine as it applies to rental or leasing car companies without exception. So what is the exception and why is there an exception? Is the exception mere surplusage?
Subsection (b) of the Graves Amendment clearly provides for exceptions but the majority in the instant case and those cases cited by the majority to support its conclusion cannot conjure up any example applying the exception. Since subsection (a)(1) does not relieve the rental or leasing car companies of their own negligence, what possible relationship could there be to "financial responsibility" or "liability insurance" unless it is to allow states to enact legislation which addresses the need to protect the citizens of its state for personal injuries or property damages from vehicles placed on the roadway for the commercial benefit of these companies? As rental cars and long term lease vehicles remain on the lots of these enterprises, what possible need is there for any insurance on these vehicles? It is only when these vehicles are rented or leased that they pose any danger to the public at large and only then is there a need for "financial responsibility" or "liability insurance."
To conclude that section 324.021(9)(b)(2) does not fit within the exception of the Graves Amendment seems to me to be a very strained construction of "financial responsibility" and "liability insurance." I would therefore reverse the summary judgment.
FARMER and STEVENSON, JJ., concur in this dissent.
NOTES
[1] We sua sponte consider this case en banc in conjunction with our en banc consideration of Brookins v. Ford Credit Titling Trust, No. 4D07-2010, 993 So.2d 178, 2008 WL 4756385 (Fla. 4th DCA Oct. 31, 2008).
[2] Although we are not required to follow the Eleventh Circuit on questions of federal law, we find it to be persuasive on the preemption question presented in this case. See Carnival Corp. v. Carlisle, 953 So.2d 461, 465 (Fla. 2007); Pignato v. Great Western Bank, 664 So.2d 1011, 1015 (Fla. 4th DCA 1995).
[3] Section 324.021(7), Florida Statutes (2007) contains a similar definition, with different monetary amounts.
[4] The amounts of required insurance under the 1947 act were $5,000 for bodily injury or death of one person in any one accident, $10,000 for bodily injury or death to two or more persons in any one accident, and $1,000 because of injury to or destruction of property of others in any one accident. Chapter 23626, Florida Statutes (1947) § (1)(f).
[5] The mechanism of Florida's financial responsibility law operates to ensure minimum levels of responsibility following an accident. After a motor vehicle accident, the investigating law enforcement officer must forward a report of the crash to the Department of Highway Safety and Motor Vehicles. § 324.051(1)(a), Fla. Stat. (2007). The Department is required to suspend "the license of each operator and all registrations of the owner of the vehicles operated by such operator." § 324.051(2)(a), Fla. Stat. (2007). The suspension requirement is subject to certain exceptions; one of these is that the owner or operator had in effect at the time "of the crash an automobile liability policy with respect to all of the registered motor vehicles owned by such operator or owner," containing "limits of not less than those specified in s. 324.021(7)." § 324.051(2)(b), Fla. Stat. (2007). Section 324.021(7) contains the $10, 000/$20,000/$10,000 minimums that establish proof of financial responsibility.
[6] In Garcia, the eleventh circuit made the same observation in rejecting the appellants' argument, which was similar to the reasoning in Brookins:

If we construe the Graves Amendment's savings clause as appellants wish, it would render the preemption clause a nullity. Every vicarious liability suit would be rescued because it could result in a judgment in favor of an accident victim, even though the judgment is premised on the very vicarious liability the Amendment seeks to eliminate. The exception would swallow the rule.
540 F.3d at 1248.
[7] 49 U.S.C. § 30106 (2005). I refer to the two subsections of § 30106 throughout as Graves § (a) and Graves § (b).
[8] I use the terms Company and Companies to mean those entities in the business of leasing or renting motor vehicles in commerce.
[9] § 324.021(9)(b), Fla. Stat. (2008).
[10] By Customers I mean the lessees under long term leases and the renters under short term rental agreements.
[11] Garcia v. Vanguard Car Rental USA Inc., 540 F.3d 1242 (11th Cir.2008).
[12] Garcia, 540 F.3d at 1248; Majority Op. at 623.
[13] "Section 324.021(9)(b)2 is not a `financial responsibility or liability insurance requirement;' the section does not require short term lessors to purchase insurance." Op. at 621.
[14] "The `Florida legislature's endorsement of and limitations on' the vicarious liability imposed under the dangerous instrumentality doctrine is not a `financial responsibility' requirement" because "[t]he monetary figures in [§ 324.021(9)] are caps on liability unrelated to a lessor's ability to register a motor vehicle." Op. at 621.

The wording of this sentence evidences an important feature of the majority's failure of comprehension. From its plain text, the monetary figures are obviously not "caps on liability." Rather they are minimum insurance amounts that entirely eliminate any vicarious liability of the lessor if the coverage is effective when an accident occurs.
[15] That great source of common understanding and usage, the Internet, is filled with evidence of this meaning. See, e.g., Answers.yahoo.com ("Law requiring the operator of an automobile to show financial ability to pay for automobile-related losses. In many states evidence usually takes the form of a minimum amount of automobile liability insurance"); Metaglossary.com ("law that requires motorists to have auto insurance); About.com ("easiest way of showing this is by having car insurance and that is what the majority of people do to comply with this law"); Freeadvice.com ("States that do not require you to have insurance require a demonstration of financial responsibility"); Carinsurance.com ("In Florida, vehicle owners or operators may be required to carry two types of insurance. The first ... is detailed in the Florida Motor Vehicle No-Fault Law.... The second type ... is listed under the Financial Responsibility Law, Ch. 324 of the Florida Statutes").
[16] The term financial responsibility is strewn all throughout federal statutes. See e.g. 7 U.S.C. § 6d(c)(1) (involving futures merchants); 8 U.S.C. § (alien child support); 12 U.S.C. § 1831o(e)(2)(E)(ii)(III) (securities brokers regulatory requirements); 15 U.S.C. § 78c(40) (defining "financial responsibility rules" for Securities Exchanges); 15 U.S.C. § 2048 (title of statute); 15 U.S.C. § 3905(d) (recognizing state authority "to specify acceptable means of demonstrating financial responsibility"); 16 U.S.C. § 1383a(i) (authorizing agency to prescribe amount and form of "financial responsibility"); 20 U.S.C. § 1011e (entitled Financial responsibility of foreign students); 29 U.S.C. § 1112(e) (adequate evidence of financial responsibility of plan under ERISA); 33 U.S.C. § 2701(13) (defining "Guarantor" as any person "who provides evidence of `financial responsibility' for a responsible party for oil pollution); 33 U.S.C. § 2719 (authorizing states to enforce requirements for evidence of financial responsibility for oil pollution on navigable waters); 38 U.S.C. § 7317(e) (in Veterans Administration contracting, defining protection of indemnification requirement to include "private insurance, private contractual indemnities, self-insurance, other proof of `financial responsibility' or a combination of such measures"); 42 U.S.C. § 2210(b)(1) (defining financial protection to include "private insurance, private contractual indemnities, self-insurance, other proof of financial responsibility, or a combination of such measures"); 42 U.S.C. § 2458c(b)(2) (requiring a developer of an experimental space vehicle to provide "financial responsibility in amounts to compensate for the maximum probable loss from claims by" injured third parties); 42 U.S.C. § 6924(a) (authorizing regulations for hazardous waste management including assurances of "financial responsibility (including financial responsibility for corrective action) as may be necessary or desireable"); 42 U.S.C. § 9608 (entitled Financial responsibility and requiring evidence of up to $5 million for vessels carrying hazardous substances); 42 U.S.C. § 9614(d) (supplanting state financial responsibility requirements with federal financial responsibility regulations); 42 U.S.C. § 9620(a)(3) (exempting application of statute to any requirements of bonding, insurance or financial responsibility); 42 U.S.C. § 16396(f)(5)(B) (providing that "participants in a prize competition under this subsection shall be required to obtain liability insurance or demonstrate financial responsibility, in amounts determined by the Secretary"); 46 U.S.C. § 3717(a) (requiring reporting of compliance with financial responsibility requirements of applicable laws); 46 U.S.C. § 40902 (entitled Financial responsibility and setting requirements for any bond, insurance or other surety furnished as financial responsibility); 46 U.S.C. § 44103 (Chapter 441 of U.S. Code designated "Evidence of Financial Responsibility for Passenger Transportation"; statute titled "Financial responsibility to pay liability for death or injury"; setting minimum amounts of financial responsibility and, as means of providing, insurance, bond, self-insurance and any other means); 49 U.S.C. § 5109(a)(3) (requiring motor carriers to comply with "applicable United States motor carrier safety laws and regulations and applicable minimum financial responsibility laws and regulations"); 49 U.S.C. § 14501(2) (saving from any preemption the authority of States "to regulate carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization"); 49 U.S.C. § 31138 (entitled "Minimum financial responsibility for transporting passengers").

In only one of these statutes did Congress bother with a definition. Did Congress intend financial responsibility law in these statutes to mean only laws mandating compulsory insurance as a condition of registration? In every other instance Congress has used the term to refer not to a single statute or particular provision within a statute but only in a general sense to refer to a whole class. So by what interpretive rules could a court look for a narrow, sub-category meaning in place of the obvious categorical usage?
[17] Actually their opinion argues two rationales for meaning. They say that financial responsibility has a common understanding but also that it is a legal term of art. Logically, it cannot be both. If something is commonly understood in ordinary parlance, it would not qualify as a term of art. A term of art is something understood only by the cognoscenti in the art.
[18] When the Graves Amendment was adopted, one rental-car-industry organ explained it thus: "Every car rental company is required to maintain insurance coverage on each of its vehicles that meets those state requirements." New Amendment, April 1, 2006, bulktransporter.com/mag/transportation_new_amendment/. Still another added:

"Notwithstanding the Graves Amendment's preemption of state vicarious liability laws, motor vehicle lessors should not expect total immunity in all litigation. Congress expressly recognized the continuing validity of state financial responsibility and/or minimum insurance requirements in the Graves Amendment [citing Graves § (b)]...."
BNET Business Network ("The go-to place for management") May 2006, findarticles.com/p/articles/mi_qa5349/is_200605/ai_n21391543/. Indeed, the Business Network pointedly said of Florida law:
"A number of states, including ... Florida... currently have minimum insurance requirements or financial responsibility laws applicable to motor vehicle lessors/owners."
Id. How is it that Garcia and the majority have failed to pick up this "common understanding" of financial responsibility laws in general and of Florida law in particular?
[19] The majority opinion erroneously holds that the "basic tenet of statutory construction" trumps the Supreme Court's "federal preemption principles." Op. at 623. Actually, it's the other way around. As the following discussion will show, the Supreme Court's preemption principles are themselves the applicable standards of statutory construction when federal legislation affects State health and safety laws.
[20] See Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 653, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).
[21] See U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").
[22] See U.S. Const., amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").
[23] See Cipollone v. Liggett Group Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Consideration of issues arising under the Supremacy Clause `starts with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'") (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); Allen-Bradley Local v. Wisconsin Employment Relations Bd., 315 U.S. 740, 749, 62 S.Ct. 820, 86 L.Ed. 1154 (1942) ("this Court has long insisted that an `intention of Congress to exclude states from exerting their police power must be clearly manifested.'") (quoting Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611, 47 S.Ct. 207, 71 L.Ed. 432 (1926)).
[24] Reid v. Colorado, 187 U.S. 137, 148, 23 S.Ct. 92, 47 L.Ed. 108 (1902).
[25] Medtronic Inc. v. Lohr, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).
[26] See St. Onge v. White, 988 So.2d 59 (Fla. 1st DCA 2008); Kumarsingh v. PV Holding Corp., 983 So.2d 599 (Fla. 3d DCA 2008); Bechina v. Enterprise Leasing Co., 972 So.2d 925 (Fla. 3d DCA 2007); see also Garcia v. Vanguard Car Rental USA Inc., 540 F.3d 1242 (11th Cir.2008); Dupuis v. Vanguard Car Rental USA Inc., 510 F.Supp.2d 980 (M.D.Fla. 2007).

It is especially surprising to me that the federal appellate court decisions fail to consider or discuss the Supreme Court decisions above on preemption of State police power laws, and the implications of the McCarran-Ferguson Act as to the meaning of the Graves Amendment's explicit disclaimer of preemption. The failure of all these decisions, on which the majority so heavily relies, to consider the correct preemption and McCarran-Ferguson principles renders these appellate decisions quite unreliable as precedent on this subject.
[27] § 324.011, Fla. Stat. (2008).
[28] It is true that § 324.021(9)(b) is framed as a definition of owner where the Companies' vehicles are involved. And this definition imposes the minimum insurance requirement. But the very act of defining specifies meaning. The fact of defining does not lessen the law's function as a requirement.
[29] § 324.023(1)(b), Fla. Stat. (2008).
[30] The majority dismisses any attempt to find meaning from these legislative designations as "label-based legal analysis." There are some laws  for that matter, the United States Code among them  where such titles (or labels as the majority pejoratively dismisses them) might be inserted by someone other than the enacting legislature. But that is not true in Florida, where the Legislature itself is responsible for Chapter and Statute titles. § 11.242(5)(c), Fla. Stat. (2008). Ergo, the legislative designation of Chapter 324, and the legislative designation of § 324.021(9)(b) as well, have as much meaning as any word in the full body of text. Because these titles were placed there by the Legislature rather than some book editor, they have strong substantive effect as to the meaning of the statute. The Congress adopting the Graves Amendment could not possibly have been under any misapprehension that § 324.021(9)(b) would not be saved by Graves § (b)(2).
[31] See Edwards v. C.A. Motors Ltd., 985 So.2d 1147 (Fla. 1st DCA 2008) (noting that only an unwise lessor "would expose itself to potential liability under the dangerous instrumentality doctrine by reducing insurance coverage requirements to amounts less than the statutory minimums" [e.s.]); Sontay v. Avis Rent-A-Car Systems Inc., 872 So.2d 316 (Fla. 4th DCA 2004) (§ 324.021(9)(b) requires long-term lessees to maintain insurance); Rodriguez-Cespedes v. Creative Leasing Inc., 728 So.2d 811 (Fla. 3d DCA 1999) (agreeing that plain meaning of § 324.021(9)(b) mandates that lease agreement require insurance in the stated minimum amounts); Gedert v. Southeast Bank Leasing Co., 637 So.2d 253 (Fla. 4th DCA 1994) (§ 324.021(9)(b) clearly requires lessee to have valid insurance on leased automobile at time of accident; otherwise liability under the dangerous instrumentality doctrine reverts to the lessor).
[32] It is ever a search for "friends in the room." See Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring) ("Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").